**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

JEREMY SUNDERLAND,

                Plaintiff,

   — against —

SUFFOLK COUNTY, NEW YORK; VINCENT F.
DeMARCO, in his official capacity; CHARLES
EWALD, in his official capacity; VINCENT T.
GERACI; DENNIS RUSSO; and THOMAS
TROIANO,

                Defendants.

13-CV-4838 (JFB) (AKT)

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Seth D. Rothman
Fara Tabatabai
Ryan Y. Kim
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
seth.rothman@hugheshubbard.com
fara.tabatabai@hugheshubbard.com
ryan.kim@hugheshubbard.com

David B. Shanies
Joel A. Wertheimer
DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, 6th Floor
New York, New York 10003
Telephone:  (212) 951-1710
Facsimile:  (212) 951-1350
david@shanieslaw.com
joel@shanieslaw.com

*Attorneys for Plaintiff Jessica (Jeremy)*
*Sunderland*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................2

ARGUMENT ..............................................................................................................8

I.  THERE ARE GENUINE ISSUES OF DISPUTED FACT
    CONCERNING WHETHER DEFENDANTS WERE DELIBERATELY
    INDIFFERENT TO MS. SUNDERLAND'S MEDICAL NEEDS. ..................................8

    A.  Defendants' Failure to Provide Treatment for
        Ms. Sunderland's Gender Dysphoria Was Serious. ................................................9

        1.  Gender Dysphoria is a Serious Medical Condition. ..................................10

        2.  Defendants Failed to Provide Any Treatment
            for Ms. Sunderland's Gender Dysphoria. ................................................10

        3.  Ms. Sunderland's Hormone Therapy Was Medically
            Necessary for the Treatment of Her Gender Dysphoria. ..........................12

        4.  Defendants' Decision to Deprive Ms. Sunderland of Hormone
            Medication Was Not Based on Sound Medical Judgment........................14

        5.  Ms. Sunderland Suffered Serious Harm as a Result of
            the Deprivation of Treatment for Her Gender Dysphoria........................19

    B.  Defendants Knew and Disregarded a
        Substantial Risk of Serious Harm to Ms. Sunderland..........................................22

II.  DR. TROIANO WAS PERSONALLY INVOLVED
     IN DENYING MS. SUNDERLAND CARE................................................................25

III.  DEFENDANT SUFFOLK COUNTY IS
      LIABLE FOR DELIBERATE INDIFFERENCE. ........................................................26

IV.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ......................29

    A.  Gender Dysphoria Has Been Recognized
        as a Serious Medical Condition for Decades. ......................................................30

    B.  Ms. Sunderland Had a Clearly Established Right
        To Effective Treatment for Her Gender Dysphoria...............................................31

**TABLE OF CONTENTS**
**(continued)**

**Page**

    C.    Depriving Ms. Sunderland of Treatment for Her
        Gender Dysphoria Was Not Objectively Reasonable.......................................33

CONCLUSION...................................................................................................34

80072089_2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allard v. Gomez*, 9 Fed. Appx. 793 (9th Cir. 2001)..............................................................10, 30

*Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700 (11th Cir. 1985).............................................17

*Archer v. Dutcher*, 733 F.2d 14 (2d Cir. 1984)...........................................................................17

*Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011)....................................................................12, 23

*Brooks v. Berg*, 270 F. Supp. 2d 302 (N.D.N.Y. 2003), *vacated in part on other grounds by Brooks v. Berg*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003) ............................... *passim*

*Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995).........................................................................31

*Calhoun v. Howard*, No. 14 C 2631, 2015 WL 5462221 (N.D. Ill. Sept. 16, 2015)...................23

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ..................................................................9, 14

*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996)................................................14

*Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000)....................................................................10, 30

*Estelle v. Gamble*, 429 U.S. 97 (1976) .........................................................................................9

*Farmer v. Brennan*, 511 U.S. 825 (1994).....................................................................................22

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011).....................................................................*passim*

*Harron v. Barkley*, 219 F.3d 132 (2d Cir. 2000) ....................................................................13, 14

*Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) ..............................................................................29

*Kern v. City of Rochester*, 93 F.3d 38 (2d Cir. 1996)..................................................................27

*Konitzer v. Frank*, 711 F. Supp. 2d 874 (E.D. Wis. 2010) ..........................................................14

*Langley v. Coughlin*, 888 F.2d 252 (2d Cir. 1989)...................................................................9, 13

*LeBounty v. Coughlin*, 137 F.3d 68 (2d Cir. 1998).....................................................................29

*Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987) .........................................................10, 30

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) ...........................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 U.S. App. LEXIS 1716 (6th
Cir. Jan. 28, 1997)......................................................................................31, 32

*Petties v. Carter*, 836 F.2d 722 (7th Cir. 2016) ..................................................23

*Phillips v. Michigan Dep't of Corrections*, 731 F. Supp. 792 (W.D. Mich. 1990),
*aff'd*, 932 F.3d 696 (6th Cir. 1991)....................................................15, 20, 21, 32

*Rookard v. Health & Hosp. Corp.*, 710 F.2d 41 (2d Cir. 1983) ...................................29

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) ........................................22

*Smith v. Carpenter*, 316 F.3d 178 (2d Cir. 2003) .............................................9

*Smith v. Greifinger*, 208 F.3d 203 (2d Cir. 2000)........................................29, 34

*Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012) ............................10, 25, 30

*South v. Gomez*, No. 99-15976, 2000 WL 222611 (9th Cir. 2000) ........................15, 32

*Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010) ............................27

*Wechsler v. Steinberg*, 733 F.2d 1054 (2d Cir. 1984)................................22

*Wolfe v. Horn*, 130 F. Supp. 2d 648 (E.D. Pa. 2001)........................................*passim*

*Young v. Quinlan*, 960 F.2d 351 (3d Cir.1992) ........................................22

**Constitutional Provisions**

Eighth Amendment ........................................................................................*passim*

**Statutes and Rules**

Rule 30(b)(6)........................................................................................28

Rule 56.1 ........................................................................................2

80072089_2

Plaintiff Jessica (Jeremy) Sunderland respectfully submits this memorandum of law in opposition to Defendants' motion for summary judgment.

## PRELIMINARY STATEMENT

Defendants' motion for summary judgment is premised on the false notion that Defendants provided adequate non-hormone treatment for Ms. Sunderland's gender dysphoria and terminated her hormone therapy based on sound medical judgment.  In reality, the record demonstrates that, during the 16 months that Ms. Sunderland was incarcerated at the Suffolk County Correctional Facility ("SCCF"), she received *no treatment at all* for her gender dysphoria.  Ms. Sunderland entered SCCF with active prescriptions for hormone medication, which Defendants immediately terminated—in direct contravention of the orders of Ms. Sunderland's doctors, the standards of care, and SCCF's own policy.  While Defendants now claim that they did so because of the purported risks of that medication, the doctor who terminated her treatment testified that he could not think of any reason why he did so, and the contemporaneous records do not contain any indication of a purported concern about the risks of hormone therapy until *nearly a year* into Ms. Sunderland's incarceration and only *after* she had filed two medical grievances regarding her inability to access hormone treatment.  Defendants also claim that they made numerous efforts to seek an endocrinologist consult for Ms. Sunderland—but the contemporaneous records do not reflect those efforts, nor do they explain why they would need an endocrinologist consult when two endocrinologists had recommended Ms. Sunderland continue hormone therapy just two months prior to her incarceration.

What the contemporaneous records do reflect is that Defendants were deliberately indifferent to Ms. Sunderland's condition and the harm that she suffered as a result of their failure to treat her.  Whatever pretextual reasons they may give now, Defendants' own records show that they never had any intention of providing hormone therapy to Ms. Sunderland:  as

early as January 2013, only four months into Ms. Sunderland's incarceration, Defendants

informed her that, in regards to her hormone medication, "there will be no movement on that

front and this won't happen while [she] is incarcerated here at Suffolk County." (Defs.' Ex.[1] C

at COS 76.) Worse yet, the treatment that Ms. Sunderland received was far from an isolated

incident. The evidence shows that SCCF has a practice of deliberate indifference to the medical

needs of patients with gender dysphoria and has consistently failed to continue those patient's

necessary hormone therapy. Accordingly, Defendants' summary judgment motion should be

denied.

## STATEMENT OF FACTS

Ms. Sunderland is a United States Army war veteran and a transgender woman (*i.e.*, a

person born with male sex characteristics who identifies as female). (Pl.'s Ex. T at ¶¶ 2-3.) In

2010, after years of suffering severe distress as a result of her body not matching her gender

identity, Ms. Sunderland was evaluated and treated at the Manhattan Veterans Administration

Hospital (the "Manhattan VA") and the Callen Lorde Community Health Center ("Callen

Lorde") for gender dysphoria. (*Id*. at ¶¶ 4-5.)

Gender dysphoria (also known as "gender identity disorder" or "transsexualism") is a

medical condition defined in the American Psychiatric Association's Diagnostic and Statistical

Manual of Mental Disorders (the "DSM") as "[a] marked incongruence between one's

experienced/expressed gender and assigned gender, of at least 6 months' duration." (Pl.'s Ex. A

at 452.) A key feature of gender dysphoria is "clinically significant distress or impairment in

social, school, or other important areas of functioning" as a result of that incongruence. (*Id*.)

Gender dysphoria has been recognized in the DSM since 1980 and is widely recognized in the

---

1. References to "Defs.' Ex." are to the exhibits attached to Declaration of Megan O'Donnell [Dkt. No. 109-1].

medical profession, including by the American Medical Association, the World Health

Organization, and the World Professional Association of Transgender Health ("WPATH").

(Pl.'s Ex. B at 1; Pl.'s Ex. C; Pl.'s Ex. D at 5-6.)  For many individuals with gender dysphoria,

hormone medication—which, for a transgender woman, would involve taking female hormones

such as estrogen, as well as medication that blocks the production of testosterone—is a

"medically necessary intervention."  (Pl.'s Ex. D at 33-34; *accord* Pl.'s Ex. B at 1; Pl.'s Ex. O at

¶ 6.)  Since 1979, WPATH has published "internationally accepted Standards of Care for

providing medical treatment for people with [gender dysphoria]" (Pl.'s Ex. B at 1), with the most

recent version published in 2012 (the "Standards of Care").  (Pl.'s Ex. D at n.1.)

In May 2010, Ms. Sunderland was admitted to the Northport Veterans Administration

Hospital (the "Northport VA"), where doctors discovered a benign mass on her liver.  (Defs.' Ex.

D at COS 197.)  At that time, Ms. Sunderland was treating her gender dysphoria with hormones

that she had obtained without a prescription.  The doctors at the Northport VA advised her to

stop taking hormone medication until she was evaluated by a doctor who could prescribe proper

hormone therapy.  (*Id.*)  In November 2010, Ms. Sunderland was seen by doctors at Callen

Lorde, who determined that hormone medication was necessary treatment for her gender

dysphoria and started her on a regimen of estrogen, spironolactone (a testosterone blocker), and

Zoladex (an injectable testosterone blocker).  (*Id.*)

In August 2011, Ms. Sunderland's doctors temporarily stopped administering estrogen to

see whether that would that affect the size of the mass on her liver.  (*Id.* at COS 197, COS 290-

91.)  The doctors continued Ms. Sunderland's testosterone blockers.  (*Id.*)  By May 2012, it had

become clear that stopping the estrogen had no effect on the size of the liver mass, and Ms.

Sunderland instead underwent surgery to remove it.  (*Id.* at COS 197.)  The surgery was

3

successful, and later that month, Ms. Sunderland's surgeon cleared her to restart estrogen

therapy. (*Id.* at COS 203.) A few weeks later, Ms. Sunderland's gastroenterologist and two

endocrinologists also approved the resumption of her estrogen therapy. (*Id.* at COS 195, COS

202.) In early July 2012, Ms. Sunderland picked up her prescriptions for estrogen and her

testosterone blockers, which she had continued to take without interruption since November

2010. (Pl.'s Ex. O at ¶¶ 28-30; Pl.'s Ex. T at ¶¶ 5-15.) She filled those prescriptions again on

August 20, 2012. (Pl.'s Ex. O at ¶ 30.)

On September 8, 2012, Ms. Sunderland was arrested and incarcerated at the Suffolk

County Correctional Facility ("SCCF"). (Pl.'s Ex. T at ¶ 13.) SCCF's medical intake process,

she reported to Defendant Dr. Dennis Russo that she had active prescriptions for hormone

medication to treat her gender dysphoria. (Pl.'s Ex. T at ¶¶ 17-18.) Contrary to internationally

recognized standards of care for the treatment of gender dysphoria, as well as SCCF's policy to

continue an inmate's active prescriptions unless "there were noticeable side effects to that

prescription at the time of admission," Dr. Russo abruptly discontinued all of Ms. Sunderland's

hormone medication, purportedly because he needed to verify her prescription. (*See* Pl.'s Ex. D

at 67-68; Pl.'s Ex. E at COS 600; Pl.'s Ex. H at 47:2-49:2; Defs.' Ex. C at COS 88-89.)

Rather than calling Ms. Sunderland's treating physicians or pharmacy to verify her

prescription—as was his stated practice—Dr. Russo refused to treat Ms. Sunderland's gender

dysphoria until he received her medical file from the Manhattan VA. (Defs.' Ex. C at COS 88-

89; Pl.'s Ex. H at 50:10-23.) That process took six weeks. (Defs.' Ex. C at COS 162, COS 81.)

Those records confirmed that Ms. Sunderland had been taking testosterone blockers since

November 2010 and that she had restarted estrogen therapy in July 2012, following the

recommendation of her surgeon, gastroenterologist, and two endocrinologists. (Defs.' Ex. D at

195, 202-03.)  Despite having confirmation in October 2012 that Ms. Sunderland had entered SCCF with active prescriptions for hormone medication—and knowing that continuing to withhold that medication was contrary to the instructions of Ms. Sunderland's doctors— Defendants continued to deprive Ms. Sunderland of hormone therapy or any other treatment for gender dysphoria.  SCCF's medical records from October 2012 do not contain any indication of the basis for that decision.

Months passed without any further action on Ms. Sunderland's request to receive her prescribed hormone therapy.  On November 28, 2012, Ms. Sunderland told Defendant Dr. Thomas Troiano, a psychiatrist at SCCF, that the anti-depressants she was taking were not doing anything to alleviate her depression because the "root" of her distress was her "lack of hormone therapy." (Defs.' Ex. C at COS 77.)  In his progress note from that date, Dr. Troiano reported that he spoke with Defendant Dr. Vincent Geraci, SCCF's Medical Director, about Ms. Sunderland's request for hormone therapy. (*Id*.)  At Ms. Sunderland's next visit with Dr. Troiano, he told her that, in regards to her hormone therapy, "**there will be no movement on that front and this won't happen while [she] is incarcerated here at Suffolk County**." (Defs.' Ex. C at COS 76 (emphasis added).)  Another SCCF psychiatrist repeated that message to Ms. Sunderland a few weeks later, noting that he had spoken to her "about [her] hormone therapy and how **this will not be provided during [her] incarceration**." (Defs.' Ex. C at COS 53.)

In late January 2013, almost five months after Ms. Sunderland entered SCCF, Dr. Russo noted—for the first time—that he would like an outside endocrinologist to consult on one of the testosterone blockers that Ms. Sunderland had been taking before she entered the prison because "we do not stock this [medication] routinely." (Defs.' Ex. C at COS 67, COS 99.)  He did not

mention needing a consult on any of the other hormone medications that Defendants were withholding from Ms. Sunderland.  After Dr. Russo made that notation in Ms. Sunderland's records, the contemporaneous records show that nothing further happened and no attempt was made to secure any consultation for months.

On April 15, 2013, Ms. Sunderland filed her first official medical grievance with SCCF concerning Defendants' failure to treat her.  (Pl.'s Ex. R at COS 429.)  Two days later, a nurse practitioner purportedly called the Manhattan VA for the first time since Ms. Sunderland entered SCCF, but was unable to reach anyone at the hospital.  (Defs.' Ex. C at COS 40.)  Following that attempt, the records show that Defendants did nothing for more than four additional months, until after August 30, 2013 when Ms. Sunderland filed a second grievance over her failure to receive her prescribed hormone medication.  (Pl.'s Ex. R at COS 433.)  The next day, a nurse practitioner saw Ms. Sunderland in connection with her grievance.  (Def. Ex. C at COS 29.)  The record of that meeting—almost a year after Defendants terminated Ms. Sunderland's prescriptions for hormone medication—contains the *first reference* in Defendants' records to any purported concern about the risk of continuing Ms. Sunderland's hormone therapy in light of her past liver issues or otherwise.  (*Id.*)  Defendants continued to do nothing to address Ms. Sunderland's need for hormone therapy or provide any other treatment for her gender dysphoria.

In September 2013, Ms. Sunderland filed a medical writ with the Suffolk County Supreme Court concerning Defendants' deprivation of her hormone treatment.  (Defs.' Ex. Q at 2:8-21.)  On October 2, 2013, Judge Joseph Farneti of the Supreme Court of New York held a hearing on Ms. Sunderland's writ.  (*Id.*)  On the same day as the hearing, a nurse at SCCF entered a progress note that she described as a "late entry."  (Def. Ex. C at COS 22.)  In that "late entry" note from October 2, 2013, the nurse claimed to have faxed a request for an outside

consult to Stony Brook Risk Reduction and Disease Management almost ten months before on February 7, 2013 and again on April 17, 2013.  (*Id.*)  She also claimed that an appointment for Ms. Sunderland had been made at that facility for August 13, 2013, but was later canceled because Stony Brook decided that they could not treat Ms. Sunderland.  (*Id.*)  Contrary to SCCF's policy, there is no contemporaneous evidence of any faxes or conversations with Stony Brook, or the scheduling of any appointment, and no explanation for the delay in writing the progress note or the lack of evidence of its contents.[2]  The progress note also stated that Dr. Geraci told the nurse "**to take no further action until further notice**."  (*Id.*)

On October 9, 2013, Dr. Geraci entered a progress note to "present the[ ] facts" of Ms. Sunderland's case in order to "get the case [in the Suffolk County Supreme Court] dismissed":

> I reviewed the chart.  It is apparent that this patient has a history of complications (liver adenoma) related most likely to the use of hormone "treatment" for a transgender transition from male to female.  In an effort to accommodate this patient's preference, we made numerous attempts to get appointments with several Endocrine specialists including the following: VA in Manhattan and Northport (records received and in chart), Stony Brook University Hospital, Peconic Bay Medical Center, and other local (private) specialists in the community.  In every case, we were unsuccessful in getting a consultation for various reasons.

> However, this is not an emergency and the patient is being sent to the State prison system in early November.  The patient is well aware that the Endocrinologists in the local community are not willing to address his transgender preference and she/he is hoping to get "treatment" in the prison system once upstate according to his discussion with the social worker.

> We made every reasonable attempt to accommodate this patient's request for this non-essential "treatment" and we were unsuccessful.  This "treatment" is not without significant potential risk and requires the expertise of an experienced specialist in my opinion.

---

2.   The record mentions one other attempt in October 2013—the day of Ms. Sunderland's writ hearing—to secure an appointment with the Northport VA, which allegedly refused to treat Ms. Sunderland.  (*Id.*)

> Nothing further to do regarding this particular case other than to present these facts to the judge in Writ Court and, hopefully (under the circumstances), get the case dismissed.

(Defs.' Ex. C at COS 11.)

On October 30, 2013, Judge Farneti held another writ hearing to determine whether Defendants had made any progress in providing Ms. Sunderland her medical treatment.  (Defs.' Ex. R at 2:7-12.)  During that hearing, Judge Farneti noted that "[t]here are other top tier medical facilities on the Island they could attempt referrals for," including "North Shore University Hospital in Manhasset and several other facilities on the Island, endocrinal businesses that would probably be equipped and qualified and too [sic] have the credentials you refer to deal with this" and admonished SCCF that "a cynical Judge might come to the conclusion that this must have been rope-a-doped in the hopes that [Ms.] Sunderland would be transferred upstate." (*Id*. at 4:1-3, 5:14-24.)

After that hearing, Ms. Sunderland remained at SCCF for another three months.  At no point during that time did Defendants attempt to obtain an outside consult from any of the facilities the Suffolk County Supreme Court named at the writ hearing or do anything at all to address the continuing deprivation of treatment for Ms. Sunderland's gender dysphoria.  On January 2, 2014, Ms. Sunderland was discharged from SCCF and transferred to New York's Downstate Facility, where she received hormone medication until her release on December 14, 2016.  (Defs.' 56.1 Stmt. ¶¶ 4, 86-88, Defs.' Ex. E at 59, 88.)

## ARGUMENT

I.   **THERE ARE GENUINE ISSUES OF DISPUTED FACT CONCERNING WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO MS. SUNDERLAND'S MEDICAL NEEDS.**

The Eighth Amendment requires that Defendants provide "reasonably necessary medical care" to the inmates at SCCF.  *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989).

8

Defendants have violated that duty if their conduct demonstrates "deliberate indifference to [the] serious medical needs" of an inmate. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is "recklessness in the face of a substantial risk of harm." *See id.*; *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

Here, Ms. Sunderland's gender dysphoria constituted a serious medical need, and Defendants were deliberately indifferent—and, indeed, outright hostile—to Ms. Sunderland's condition. Defendants' refusal to provide Ms. Sunderland with her medically-prescribed therapy caused substantial harm to Ms. Sunderland.

Despite their refusal to provide Ms. Sunderland with hormone therapy, Defendants claim that they nevertheless provided her with adequate treatment. That is not true and, at the very least, is an issue that turns on material disputed facts that preclude summary judgment. Indeed, the Second Circuit has held that, "[w]hether [a defendant's] alleged conduct . . . amounted to deliberate indifference to serious medical needs or merely involved misdiagnosis or malpractice not of constitutional dimensions [is a] question[ ] obviously requiring determination [ ] by the finder of facts." *Langley*, 888 F.2d at 254.

A.   **Defendants' Failure to Provide Treatment for Ms. Sunderland's Gender Dysphoria Was Serious.**

Whether a plaintiff was deprived of adequate medical care for a serious medical need is a highly "contextual and fact-specific . . . inquiry." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). Defendants concede that Ms. Sunderland suffers from gender dysphoria and that gender dysphoria is a condition that requires treatment (Defs.' Mem. at 29, 31-32.), but argue that (i) Defendants provided adequate treatment for Ms. Sunderland's gender dysphoria, and (ii) there is no evidence that Ms. Sunderland suffered serious harm as a result of Defendants' failure to continue her prescriptions for hormone medication. (*Id*. at 15-16, 24.) Defendants are

wrong.  There is ample evidence in the record demonstrating that Defendants failed to provide *any* treatment for Ms. Sunderland's gender dysphoria, that there was no valid medical basis for that failure, and that Ms. Sunderland suffered serious harm as a result.

### 1.    Gender Dysphoria is a Serious Medical Condition.

It is well-established that treatment of gender dysphoria constitutes a "serious medical need" for purposes of the Eighth Amendment.  The DSM has recognized gender dysphoria since 1980, and the American Medical Association confirmed in 2008 that gender dysphoria was a "serious medical condition."  (Pl.'s Ex. A.)  Gender dysphoria has also been widely recognized in the medical profession, including by the World Health Organization and WPATH.  (Pl.'s Ex. D at n.1.)

In line with the consensus in the medical community, courts have consistently recognized treatment of gender dysphoria as a serious medical need.  *See, e.g.*, *Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Allard v. Gomez*, 9 F. App'x 793, 794 (9th Cir. 2001); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244-45 (D. Mass. 2012); *Brooks v. Berg*, 270 F. Supp. 2d 302, 309 (N.D.N.Y. 2003), *vacated in part on other grounds by Brooks v. Berg*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 652 (E.D. Pa. 2001).

### 2.    Defendants Failed to Provide Any Treatment for Ms. Sunderland's Gender Dysphoria.

Defendants' arguments rest on the false claim that "[i]t is undisputed that Plaintiff received medical treatment for her gender dysphoria."  (Defs.' Mem. at 14.)  Specifically, Defendants argue that they provided "adequate treatment" to Ms. Sunderland in the form of "anti-depressants," "routine therapy sessions," and "requests for outside consult[s]."  (*Id*. at 16.)

There is a genuine issue of disputed fact concerning whether any of these constituted adequate treatment—or any treatment—of Ms. Sunderland's gender dysphoria.

First, anti-depressants are not treatment for gender dysphoria.  The Standards of Care do not even mention anti-depressants among the list of possible treatments for gender dysphoria, but reference them only as an option for treating for "coexisting mental health concerns"—*i.e.*, conditions that an individual suffers from *in addition to* gender dysphoria, such as depression.  (Pl.'s Ex. D at 24-25.)  Consistent with those guidelines, Ms. Sunderland's psychiatric expert, Dr. Eric Yarbrough, testified that there are "no guidelines about treating Gender Dysphoria with any sort of antidepressive" and that the use of anti-depressants is recommended only as a treatment for depression "*alongside* Gender Dysphoria"—not as treatment for gender dysphoria itself.  (Pl.'s Ex. N at 105:7-13.)

In line with that medical consensus, the court in *Wolfe v. Horn*, 130 F. Supp. 2d 648, 653 (E.D. Pa. 2001), denied summary judgment on a deliberate indifference claim where the defendants claimed they had provided adequate treatment to an inmate suffering from gender dysphoria by prescribing an anti-depressant.  There, the court found that "while [plaintiff] may have received some medical attention in prison [in the form of anti-depressants], there is a fact question [precluding summary judgment] as to whether [plaintiff] received any treatment for transsexualism."  *Id.*; *see also Fields*, 653 F.3d at 556 ("Although [the Department of Corrections] can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder.").  Likewise, here, there is at least a factual dispute as to whether anti-depressants could constitute treatment of Ms. Sunderland's gender dysphoria when the prevailing medical view is that they do not.

11

Second, while Ms. Sunderland was able to see a prison psychiatrist for therapy sessions, none of the psychiatric staff at SCCF had any training in the treatment of gender dysphoria, knew anything about the standard of care for the treatment of gender dysphoria, consulted any standards of care, or undertook to educate themselves in any way on the appropriate psychiatric or psychological treatment for gender dysphoria.  (Pl.'s Ex. I at 30:18-32:25, 72:19-73:5, 77:20-78:21).  As a result, those psychiatrists could not have treated Ms. Sunderland for her gender dysphoria because they had no knowledge, training, or experience concerning how to do so.

Finally, a "request for outside consult" is not treatment.  In this case, the alleged "treatment" consisted of a notation on Ms. Sunderland's records that appeared more than four months after Defendants abruptly discontinued Ms. Sunderland's hormone medication and then—several months later and only *after* Ms. Sunderland filed grievances with the prison—a few phone calls allegedly placed to medical professionals on Long Island who allegedly refused to treat Ms. Sunderland.  (*See supra* at 4-6.)  None of those purported "efforts" resulted in Ms. Sunderland receiving any actual treatment.

### 3.   Ms. Sunderland's Hormone Therapy Was Medically Necessary for the Treatment of Her Gender Dysphoria.

Hormone medication is often medically necessary treatment for gender dysphoria.  (Pl.'s Ex. D at 5, 8, 33 (hormone therapy is "a medically necessary intervention for many transsexual, transgender, and gender non-conforming individuals with gender dysphoria"); Pl.'s Ex. B at 1:26-26 ("[a]n established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery" for patients with gender dysphoria); Pl.'s Ex. O at ¶ 6 ("hormone therapy is a medically necessary intervention" for individuals suffering from gender dysphoria); *see also Battista v. Clarke*, 645 F.3d 449, 454

(1st Cir. 2011) ("[F]or ten years, health professionals have been recommending hormone therapy as a necessary part of the treatment" for gender dysphoria).

The record is clear—and Defendants do not dispute—that Ms. Sunderland's physicians prescribed her hormone medication as treatment for her gender dysphoria. (*See, e.g.*, Defs.' Ex. D at 195, 202-03; Pl.'s Ex. O at ¶ 30; Defs.' Ex. C at COS 1, COS 81; Pl.'s Ex. T at ¶¶ 5-15.) That prescription evidences the conclusion of Ms. Sunderland's doctors that hormone therapy was medically necessary to treat Ms. Sunderland's gender dysphoria. Defendants' decision to deny hormone therapy to Ms. Sunderland was contrary to the instruction of her doctors and deprived her of the medication needed to treat her condition.

As demonstrated above, Defendants did not provide *any* treatment for Ms. Sunderland's gender dysphoria. That alone is a violation of the Eighth Amendment's requirement that prison officials provide "reasonably necessary medical care" for any "serious medical need." *See, e.g.*, *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989). But even if Defendants had provided *some* treatment for Ms. Sunderland's gender dysphoria, they would still be liable for deliberate indifference because they failed to provide Ms. Sunderland with the medication her doctors had prescribed. *See, e.g.*, *Harron v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) ("[e]ven if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates' needs if they fail to provide prescribed treatment"). In *Fields v. Smith*, the defendants similarly claimed that, although they had not provided hormone therapy to the plaintiff, they had provided alternative treatment for gender dysphoria. 653 F.3d at 555. The court disagreed, holding that the Eighth Amendment requires "effective treatment" for the serious medical needs of prisoners, noting that "defendants did not produce any evidence that another treatment could be an adequate replacement for hormone therapy" and "failed to present evidence rebutting the

testimony that [psychotherapy, anti-psychotics, and anti-depressants] do nothing to treat the underlying disorder." *Id*. at 556.  Defendants here have similarly failed to make any such showing.

### 4.   Defendants' Decision to Deprive Ms. Sunderland of Hormone Medication Was Not Based on Sound Medical Judgment.

Defendants argue that they are entitled to summary judgment because their decision to deprive Ms. Sunderland of hormone medication that her doctors had prescribed was based on informed medical judgment concerning the alleged "risks" of that medication.  (Defs.' Mem. at 14-15; *see also Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir.1998) ("decisions concerning medical care for an inmate must be based upon "sound medical judgment.").)  The facts demonstrate at least a serious dispute on that issue.

Deliberate indifference may be inferred where "the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)).  Here, the record shows that Defendants (i) violated both the standard of care and SCCF's own policy by abruptly terminating Ms. Sunderland's active prescriptions for hormone medication; and (ii) deliberately disregarded the orders of Ms. Sunderland's treating physicians.

First, by October 2012 at the latest, Defendants knew that continuing to deprive Ms. Sunderland of hormone medication was directly contrary to the instructions of her doctors, but continued to withhold that medication.  (*See supra* at 6-8.)  Their decision to do so is sufficient on its own to create a triable issue on deliberate indifference.  *See, e.g.*, *Harron v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) ("prison officials . . . [may] still be deliberately indifferent to

inmates' needs if they fail to provide prescribed treatment."); *South v. Gomez*, No. 99-15976, 2000 WL 222611, at *2 (9th Cir. 2000) (abruptly discontinuing hormone medication that inmate was already receiving prior to transfer to prison could violate Eighth Amendment); *Phillips v. Michigan Dep't of Corrections*, 731 F. Supp. 792, 800-01 (W.D. Mich. 1990), *aff'd*, 932 F.3d 696 (6th Cir. 1991) (denial of properly prescribed hormone therapy constituted deliberate indifference); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 653 (E.D. Pa. 2001) ( "abrupt termination of prescribed hormonal treatments by a prison official with no understanding of [plaintiff's] condition . . . could constitute 'deliberate indifference'").

Second, while Defendants now claim that they discontinued Ms. Sunderland's prescription for hormone medication because of concerns about the risks associated with hormone therapy, the contemporaneous records tell a different story.  When Ms. Sunderland entered SCCF in September 2012, she reported that she had current, valid prescriptions for hormone medication to treat her gender dysphoria.  (Defs.' Ex. C at COS 97; Pl.'s Ex. T at ¶¶ 10-15.)  In violation of both the requirement in the Standards of Care that "[p]eople who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies," as well as SCCF's own policy to continue active prescriptions, Dr. Russo immediately discontinued Ms. Sunderland's prescription for hormone medication.  (Defs.' Ex. C at COS 88-89; Pl.'s Ex. E at COS 600; Pl.'s Ex. H at 47:2-49:2.)  SCCF's records do not reflect any reason for that radical departure from the Standards of Care or SCCF's policy, and Dr. Russo could not articulate why he continued to deny hormone medication to Ms. Sunderland after he received records verifying that she had been taking testosterone blockers for nearly two years and had been cleared to restart estrogen, stating that he "**[couldn't] think of anything that would cause me to withhold [that medication].**"  (Pl.'s Ex. H at 153:10-16 (emphasis added).)

There is no explanation in the records as to the basis for Defendants' continuing decision to ignore the orders of Ms. Sunderland's treating physicians—including her surgeon, gastroenterologist, and *two endocrinologists*—who recommended the continuation of her hormone medication just two months prior to her incarceration at SCCF.[3]  (Defs.' Ex. D at 195, 202-03; Defs.' Ex. C at COS 81, COS 88-89.)  Quite simply, the record does not reflect any medical judgment at all in the decision to terminate Ms. Sunderland's hormone therapy.

Instead, the evidence shows that Defendants made up their minds as early as January 2013—a full year before she left the prison—that they would not provide hormone therapy to Ms. Sunderland.  At that time, Defendant Dr. Thomas Troiano reported on a discussion that he had with Defendant Dr. Vincent Geraci, in which Dr. Geraci had informed him that Ms. Sunderland would not receive hormone therapy and that "there will be no movement on that front and this won't happen while [she] is incarcerated here at Suffolk County."  (Defs.' Ex. C at COS 76.)  Another record from a few weeks later similarly notes that an SCCF psychiatrist had spoken to Ms. Sunderland "about [her] hormone therapy and how this will not be provided during [her] incarceration."  (*Id.* at COS 53.)  Those records are plainly inconsistent with Defendants' claim that Ms. Sunderland's request for hormone therapy "was not blatantly denied." (Defs.' Mem. at 15-16.)

Defendants' decision early on that they would not provide hormone therapy to Ms. Sunderland explains why their first attempt to secure an outside consultation for Ms. Sunderland

---

3.   Defendants now argue that, even though they received records showing that Ms. Sunderland's physicians were prescribing testosterone blockers, had cleared her to restart estrogen, and had indicated that they would "mail medication to the patient," because they had no record that the mailing was actually done or that Ms. Sunderland filled her prescription for hormone medication, they could not continue that prescription.  (Def. Mem. at 20.)  Defendants do not explain why the orders of Ms. Sunderland's treating physicians to continue testosterone blockers and resume estrogen medication just two months prior to her incarceration would not be sufficient to verify that Ms. Sunderland had medical approval to take those medications.  Nor do they explain why, if their concern truly was verifying those medications, they did not call the Manhattan VA until eight months after Ms. Sunderland entered the facility and never even attempted to call her pharmacy.

did not come until *eight months* after they terminated Ms. Sunderland's medication and only in response to the filing of her first medical grievance. (*Id.* at COS 40; Pl.'s Ex. R at COS 429.) It explains why even those efforts only included a call to the Manhattan VA, with no explanation as to why they took so long to do so and no evidence that they ever followed up after they were unable to reach the Manhattan VA on their first attempt. (Defs.' Ex. C at COS 40.) It also explains why nothing happened after that for *another four months*, until Ms. Sunderland was forced to file a second grievance, at which point Defendants created the first record that mentioned their pretextual reason for denying hormone medication to Ms. Sunderland—that they were concerned about the "risks" of such medication and needed an endocrinologist to approve that medication—without any explanation as to why they continued to ignore the fact that *two endocrinologists* had already signed off on Ms. Sunderland's hormone prescriptions.[4] (*Id.* at COS 29; Pl.'s Ex. R at COS 433.) And it explains why, after Ms. Sunderland filed a medical writ, Defendants attempted to backfill their records with "late entries" listing supposed efforts they had made months earlier to obtain an outside consultation—*for which no contemporaneous records exist*. (Defs.' Ex. C at COS 22.)[5]

---

4. Moreover, as Ms. Sunderland's expert witness, Dr. Matthew Leinung, the Chief of Endocrinology at Albany Medical Center, explained in his report: "[E]ven if [Defendants] were concerned about the possibility of Ms. Sunderland's hormone medication increasing her risk of developing a future liver adenoma, that does not explain why [they] discontinued *all* of Ms. Sunderland's hormone medication. . . . [O]nly estrogen carries any potential risk of liver adenoma." (Pl.'s Ex. O at ¶ 49.) Indeed, Dr. Russo testified that he was not aware of any risk relationship between Ms. Sunderland's liver issues and her non-estrogen medication that would cause him to withhold that medication. (Pl.'s Ex. H at 100:24-101:10.)

5. Even crediting Defendants' explanation that they were concerned about the risks of hormone therapy and needed an outside consult—a claim that the record does not support—there remains a triable issue as to whether Defendants made reasonable efforts to obtain that outside consult or made such little effort as to demonstrate deliberate indifference. *See Archer v. Dutcher*, 733 F.2d 14, 17 (2d Cir. 1984) (alleged logistical obstacles to delivering medical services in a prison "are factual problems to be considered and weighed by the finder of fact where there is an underlying dispute as to whether legitimate medical claims were deliberately disregarded"); *see also Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out").

Dr. Geraci's note in October 2013 further underscores the lack of medical judgment underlying Defendants' decision to deny hormone therapy to Ms. Sunderland.  In that note, Dr. Geraci evidenced his bias against Ms. Sunderland's condition by repeatedly referring to it as a "preference" rather than a serious medical condition, putting the word "treatment" in quotation marks, and characterizing that treatment as "non-essential."  (*Id*. at COS 11.)  Dr. Geraci ended by stating that there was "[n]othing further to do regarding this particular case" (*Id*.)—even though Ms. Sunderland remained at SCCF for another three months after that, and the Suffolk County Supreme Court gave Defendants a list of "top tier medical facilities" from which they could attempt to obtain an outside consultation.  (Defs.' Ex. R at 5:14-19.)  Far from the exercise of medical judgment, Dr. Geraci's note makes clear that, as the Suffolk County Supreme Court stated, Ms. Sunderland's case was "rope-a-doped in the hopes that Mr. Sunderland would be transferred upstate." (*Id*. at 5:20-24.)  Indeed, Dr. Geraci effectively conceded that point when he wrote:  "[T]his is not an emergency and the patient is being sent to the State prison system in early November . . . . [where] she/he is hoping to get 'treatment'. . . ."  (Defs.' Ex. C at COS 11.)

It is clear from this history that there is, at a minimum, a genuine factual dispute as to whether Defendants exercised any sound medical judgment in depriving Ms. Sunderland of her prescribed hormone treatment.  Indeed, Ms. Sunderland's expert witness, Dr. Matthew Leinung, the Chief of Endocrinology at the Albany Medical Center, concluded that "[t]here was no legitimate medical reason for [Defendants'] refusal to continue Ms. Sunderland's hormone therapy." (Pl.'s Ex. O at ¶ 46.)  While Defendants claim that they "weigh[ed] the pros and cons of continuing hormone therapy, versus, suspension/cessation of the medication" (Defs.' Mem. at 16), there is absolutely no contemporaneous evidence that they did so.  That justification for

withholding hormone medication from Ms. Sunderland does not even appear in the records until *nearly a year* after Ms. Sunderland entered SCCF.

Defendants argue that they cannot be faulted for depriving Ms. Sunderland of hormone medication when Ms. Sunderland's private doctors also took her off that medication.  (Defs.' Mem. at 18.)  That argument ignores the vast difference in circumstances between Defendants terminating Ms. Sunderland's prescribed medication without a proper medical basis for more than 16 months, and the periods of time during which Ms. Sunderland's physicians, for valid medical reasons, halted some or all of her hormone therapy.  (*See supra* at 4-5.)  After Ms. Sunderland was transferred from SCCF to another facility upstate, she finally received the hormone medication that she had been denied at SCCF, and she continued to receive that medication until her release.  (Defs.' 56.1 Stmt. ¶¶ 4, 86-88, Defs.' Ex. E at 59, 88.)

### 5.     Ms. Sunderland Suffered Serious Harm as a Result of the Deprivation of Treatment for Her Gender Dysphoria.

Finally, Defendants argue that they are entitled to summary judgment on Ms. Sunderland's deliberate indifference claim because Ms. Sunderland did not suffer serious harm as a result of Defendants' denial of hormone therapy.  That argument ignores both factual and expert evidence showing the opposite.[6]

First, it is well established that abrupt cessation of hormone therapy has serious physical and psychological consequences.  The Standards of Care require that "[p]eople who enter an institution on an appropriate regimen of hormone therapy [ ] be continued on the same, or similar therapies" because "[t]he consequences of abrupt withdrawal of hormones . . . include a high likelihood of negative outcomes such as surgical self-treatment by auto-castration, depressed

---

6.   Defendants separately argue that they are entitled to summary judgment because Ms. Sunderland cannot show proximate causation.  (Defs.' Mem. at 22.)  As demonstrated in this section, that is not true.

mood, dysphoria, and/or suicidality." (Pl.'s Ex. D at 68.) Ms. Sunderland's expert witness, Dr. Matthew Leinung, also noted the "serious and deleterious consequences" of withdrawal of hormone medication, including "reversal of feminizing changes, entry into a postmenopausal state, and major depression." (Pl.'s Ex. O at ¶¶ 23, 56.) The American Medical Association found that failure to treat gender dysphoria "can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death." (Pl.'s Ex. B at 1:11-13.)

Courts have also recognized that "abrupt cessation of hormone therapy can 'wreak havoc on [an individual's] physical and emotional state'" and is sufficient to establish deliberate indifference. *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (quoting *Phillips v. Michigan Dept. of Corrections*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991)); *see also Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011) ("When hormones are withdrawn from a patient who has been receiving hormone treatment, severe complications may arise. The dysphoria and associated psychological symptoms may resurface in more acute form. In addition, there may be severe physical effects such as muscle wasting, high blood pressure, and neurological complications."). In the *Phillips* case, the court found that a prison had acted with deliberate indifference when it refused to continue an inmate's hormone medication, stating: "It is one thing to fail to provide an inmate with care that would improve his or her medical state, such as refusing to provide sex reassignment surgery or to operate on a long-endured cyst. Taking measures which actually reverse the effects of years of healing medical treatment . . . is measurably worse, making the cruel and unusual determination much easier." *Phillips*, 731 F. Supp. at 800.

20

Second, there is ample evidence in the record that Ms. Sunderland suffered serious physical and psychological consequences as a result of Defendants' denial of hormone therapy. In November 2012, two months after entering SCCF, Ms. Sunderland told Dr. Thomas Troiano that the anti-depressants she was taking were not helping to relieve her depression because "the root of [that] depressive problem is [her] lack of hormone therapy." (Defs.' Ex. C at COS 77.) In April and August 2013, Ms. Sunderland filed grievances expressing distress at Defendants' refusal to continue her hormone medication. (Pl.'s Ex. R at COS 429, COS 433.) Ms. Sunderland suffered through devastating physical changes as a result of the deprivation of her hormone therapy—including hot flashes, regrowth of body hair, redistribution of body fat and changes in the shape of her body, deepening of her voice, and disappearance of her breasts—as well as the emotional distress that accompanied those changes, which represented the reversal of physical changes that had taken years of hormone therapy to attain. (Pl.'s Ex. U at 49:4-22, 53:20-59:6; Pl.'s Ex. T at ¶¶ 26-29.)

In arguing that Ms. Sunderland did not suffer any serious harm, Defendants point to the fact that Ms. Sunderland "did not exhibit any suicide ideation" and that she "expressed depression about factors unrelated to lack of hormone therapy," such as her "incarceration and lack of support in the community." (Defs.' Mem. at 17.) Defendants overlook the evidence from their own records and Ms. Sunderland's testimony that her depression was related to the lack of treatment for her gender dysphoria. (Defs.' Ex. C at COS 77.) Moreover, Ms. Sunderland has submitted expert evidence from Dr. Eric Yarbrough, the Director of Psychiatry at Callen-Lorde Community Medical Center, that the depression that Ms. Sunderland felt while incarcerated at SCCF "is consistent with symptoms of untreated gender dysphoria resulting from inability to access hormone treatment" and that "her depressive symptoms would have been

alleviated had she been permitted to continue hormone treatment at [SCCF]."  (Pl.'s Ex. M at 5-

6.)  In light of that evidence, Defendants cannot show as a matter of law that Ms. Sunderland did

not suffer serious harm as a result of the deprivation of her hormone medication.

> **B.    Defendants Knew and Disregarded a**
> **Substantial Risk of Serious Harm to Ms. Sunderland.**

A finding of deliberate indifference also requires a showing that a defendant "acted or

failed to act despite his knowledge of a substantial risk of serious harm."  *Farmer v. Brennan*,

511 U.S. 825, 842 (1994).  To establish deliberate indifference, an official "need not desire to

cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof

of awareness of a substantial risk of the harm suffices."  *Salahuddin v. Goord*, 467 F.3d 263, 280

(2d Cir. 2006).  Because the subjective element of deliberate indifference requires inquiry into a

defendant's state of mind, summary judgment is not normally appropriate.  *Young v. Quinlan*,

960 F.2d 351, 359-60 n. 21 (3d Cir.1992), *superseded on other grounds by* Title VIII of Pub. L.

No. 104-134, 100 Stat. 1321 (1996); *see also, e.g.*, *Wechsler v. Steinberg*, 733 F.2d 1054, 1058

(2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary

judgment.").

Whether an official acted with a deliberately indifferent state of mind may be

demonstrated in various ways, "including inference from circumstantial evidence." *Farmer*, 511

U.S. at 842.  Thus, "[w]hen a doctor says he did not realize his treatment decisions (or lack

thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation

against certain clues that the doctor *did* know.  Those context clues might include the existence

of documents the doctor regularly consulted which advised against his course of treatment,

evidence that the patient repeatedly complained of enduring pain with no modifications in care,

inexplicable delays or departures from common medical standards, or of course, the doctor's

own testimony that indicates knowledge of necessary treatment he failed to provide." *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (emphasis in original).

Here, the record demonstrates genuine issues of material fact concerning Defendants' awareness and disregard of Ms. Sunderland's serious medical needs.

First, within six weeks of Ms. Sunderland's entry into SCCF, Defendants knew that, by abruptly terminating Ms. Sunderland's hormone medication, they were directly contravening the orders of three treating physicians.  That fact alone is sufficient to demonstrate a triable issue on subjective recklessness.  *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (holding that, to establish deliberate indifference, "it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or *interference with prescribed health care*.'") (emphasis added); *Calhoun v. Howard*, No. 14 C 2631, 2015 WL 5462221, at *5 (N.D. Ill. Sept. 16, 2015) ("circumstantial evidence in this case is more than sufficient to demonstrate genuine issues of material fact about Defendants' awareness and disregard of Plaintiff's serious medical needs. . . . Defendant knew that three psychiatrists with significantly more experience had prescribed Thorazine for Plaintiff within the previous two months, yet . . . Defendant overrode their orders and terminated the prescription immediately after his first examination of Plaintiff.").

Second, as the Suffolk County Supreme Court recognized, the record supports a finding that Defendants "rope-a-doped" Ms. Sunderland's case "in the hopes that Mr. Sunderland would be transferred upstate."  (Defs.' Ex. R at 5:20-24.)  Dr. Geraci essentially admitted that point when he wrote—more than a year after Defendants terminated Ms. Sunderland's hormone medication—that her request for treatment was "not an emergency and the patient is being sent to the State prison system in early November . . . . [where] she/he is hoping to get 'treatment'. . . ."  (Defs.' Ex. C at COS 11.)

Third, the record shows that Defendants—particularly Dr. Vincent Geraci, SCCF's Medical Director—were not only reckless, but actually harbored animus towards transgender individuals.  On October 9, 2013, Dr. Geraci wrote a note concerning Ms. Sunderland in which he referred to her gender dysphoria as a "transgender preference" and put the word "treatment" in quotation marks whenever referring to hormone therapy.  (*Id.*)[7]  Dr. Geraci's bias against transgender individuals is further evidenced by his use of social media, where he has "liked" several anti-transgender posts.  (Pl.'s Ex. Q; *see also*, Pl.'s 56.1 Ctr. Stmt., Additional Material Facts 44-46.)

Fourth, at his deposition, Dr. Dennis Russo, the doctor who terminated Ms. Sunderland's prescription, admitted to being aware of and "concern[ed]" about the "risks" of abrupt cessation of Ms. Sunderland's hormone therapy, including entrance into a menopausal state, hot flashes, changes in body fat, reduction in breast tissue, dryness of the mucous membranes, and other physiological consequences of discontinuance of treatment.  (Pl.'s Ex. H at 23:8-16, 114:18-115:5.)  Dr. Russo also admitted that avoiding those risks was a "somewhat urgent" matter that should be addressed within days or weeks.  (*Id*. 24:17-25:9.)

Fifth, Defendants reviewed Ms. Sunderland's medical records from the Manhattan VA, which noted that Ms. Sunderland had experienced severe depression in the past as a result of her untreated gender dysphoria.  (*See, e.g.*, Defs.' Ex. D at COS 270-71, COS 307.)  Defendants

---

7.   Defendants attempt to explain away this record by arguing that Dr. Geraci's reference to Ms. Sunderland's "transgender preference" is in line with the Standards of Care, which provide that medical professionals must provide "individualized" treatment for gender dysphoria.  (Defs.' Mem. at 18.)  That argument makes no sense and is not consistent with the actual language of Dr. Geraci's note, which clearly does not refer to Ms. Sunderland's "preference" for a particular treatment plan, but rather to her gender dysphoria.  (Defs.' Ex. C at COS 11 ("The patient is well aware that the Endocrinologists in the local community are not willing to address his transgender preference . . . .").)  Likewise, Dr. Geraci's explanation in his deposition that he put the word "treatment" in quotes "because he doubted whether hormone therapy medication would do more good than harm to the patient, given her medical history" (Defs.' Mem. at 18) is bizarre, particularly given the fact Dr. Geraci knew that Ms. Sunderland's treating physicians had prescribed hormone therapy and Dr. Geraci disclaimed any expertise in evaluating the risks and benefits of that medication.  In any event, a dispute about the meaning of Dr. Geraci's notes is not appropriately resolved on summary judgment.

therefore knew that, without treatment for her gender dysphoria, Ms. Sunderland was at risk of

serious and debilitating depression.

Sixth, Ms. Sunderland repeatedly informed Defendants that she was suffering serious

harm as a result of the withdrawal of treatment for her gender dysphoria.  She told Dr. Thomas

Troiano that she was suffering from depression that her anti-depressants could not relieve

because the cause of the depression was the lack of treatment for her gender dysphoria, and she

filed two grievances complaining about Defendants' denial of hormone therapy.  (Pl.'s Ex. R at

COS 429, COS 433.)  There is therefore a triable issue as to Defendants' knowledge of the

serious harm that would result from withdrawal of treatment for Ms. Sunderland's gender

dysphoria.

## II.     DR. TROIANO WAS PERSONALLY INVOLVED
##         IN DENYING MS. SUNDERLAND CARE.

Contrary to Defendants' assertions (Defs.' Mem. at 23), Dr. Troiano was personally

involved in the decision to deny adequate care to Ms. Sunderland.  Personal involvement will be

found "where a supervisory official receives and acts on a prisoner's grievance or otherwise

reviews and responds to a prisoner's complaint."  *Brooks v. Berg*, 270 F. Supp. 2d 302, 308

(N.D.N.Y. 2003).  In particular, personal involvement for a medical care provider may be

established "by showing that the official knew of the prisoner's need for medical care and yet

failed to provide the same."  *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 243 (D. Mass. 2012).

Here, the evidence shows that Dr. Troiano knew that Ms. Sunderland needed care and failed to

provide it.  (*See generally*, Pl.'s 56.1 Ctr. Stmt., Additional Material Facts 36-43.)

There is no question that Dr. Troiano provided psychiatric care to Ms. Sunderland and

knew that she suffered from gender dysphoria.  (Pl.'s Ex. I at 38:3-19.)  But Dr. Troiano did not

consult any standards of care concerning the treatment of gender dysphoria or make any efforts

25

to educate himself on that condition or the appropriate psychological or psychiatric treatment for it.  (*Id*. at 32:4-25, 72:19-73:5.)  As a result, he failed to provide any treatment for Ms. Sunderland's gender dysphoria, which alone creates  a triable issue on his personal involvement in the denial of care to Ms. Sunderland.

Moreover, Dr. Troiano was aware that Ms. Sunderland was suffering from dysphoria as a result of the termination of her hormone therapy and that the anti-depressants she was receiving were not treating that dysphoria, but did not prescribe hormone medication for her or take any steps to ensure that she received that medication.  (*See* Defs.' Ex. C at COS 76, COS 77.) Whether or not Dr. Troiano was actually "tasked with determining whether or not hormone therapy medications should be prescribed" to Ms. Sunderland (Defs.' Mem. at 23), Ms. Sunderland was under his care and it is within the role of a psychiatrist to evaluate a patient's need for hormone medication to treat gender dysphoria, and to prescribe that medication.  (*See* Pl.'s Ex. D at 25-26; Pl.'s Ex. N at 62:25-64:1.)[8]  Accordingly, the claims against Dr. Troiano should proceed to trial.

## III.   DEFENDANT SUFFOLK COUNTY IS LIABLE FOR DELIBERATE INDIFFERENCE.

To prove a municipal liability claim, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citations omitted).  "The policy or custom need not be memorialized in a specific rule or regulation."  *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996).  Defendant Suffolk County argues that it is not liable

---

8.   Defendants argue that it is not "typical" for a psychiatrist to prescribe hormone medication (Def. Mem. at 24), but cannot dispute that Dr. Troiano had the ability to do so.  Indeed, Plaintiffs' expert Dr. Yarbrough testified that, while he does not usually prescribe hormone medication because he works alongside primary care physicians who do, he has prescribed that medication in the past, including in situations where a primary care physician was unwilling to do so.  (Pl.'s Ex. N at 62:25-64:18.)

for deliberate indifference under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978),

because there "is no policy, formal or informal, at the JMU that blanketly [sic] denies hormone

therapy medication to transgender inmates who suffer from gender dysphoria."  (Defs.' Mem. at

25.)  But Ms. Sunderland's allegation is not that she was denied treatment as a result of a

"blanket" policy to refuse *all* hormone therapy to inmates.  Her allegation is that Suffolk County

had a practice of denying transgender inmates necessary medical treatment in violation of the

Eight Amendment, which led to her harm.  There is ample evidence in the record of such a

practice.

First, consistent with evidence of his animus towards transgender individuals, Dr. Geraci

told Dr. Troiano that Ms. Sunderland would not receive treatment for gender dysphoria while at

SCCF, and both Dr. Troiano and Dr. Crowley reported that fact.  (Defs.' Ex. C at COS 53, COS

76.)  Dr. Geraci's policy of not providing necessary hormone therapy to transgender inmates is

further evidenced by his instruction to the nurse practitioner not to take further action scheduling

outside appointments, and in Dr. Geraci's note in the fall of 2013 stating that there was no action

to be taken on Ms. Sunderland's "treatment" (which he consistently put in quotes) because it was

"non-essential" and "not an emergency."  (*Id.* at COS 11.)

Second, beyond Ms. Sunderland's case, evidence of SCCF's practice of refusing to

provide medically necessary hormone therapy is evidenced by numerous inmates who sought to

receive their prescribed hormone therapies and were either completely denied their treatment,

given incomplete and/or inconsistent treatment, or had their treatment needlessly delayed before

they were released or transferred to another prison.  (*See* Pl.'s 56.1 Ctr. Stmt., Additional

Material Facts 47-106.)  By way of non-exhaustive example:

- One inmate reported being on hormone therapy medications for 20 years before
  arriving at SCCF, and she informed the medical staff that her then-current

27

prescriptions included Premarin (2.5 mg, twice per day) and Provera (2.5 mg, once per day).  SCCF's records also show that the inmate was administered Premarin on less than 20% of the days she spent incarcerated at SCCF (24 out of 121 days) and was never administered Provera.  (Defs.' Ex. S Part 2 at COS 1036-1041.)

- Another inmate was taken off all hormone therapy medications on September 30, 2015, although she was incarcerated at SCCF from September 3, 2015 through at least May 17, 2016.  (*Id*. at COS 1027.)

- A third inmate was given no hormone medication for the first month of her incarceration at SCCF, despite informing the medical staff that she had active prescriptions for that medication.  Her prescriptions were confirmed by the state correctional facility from which she was transferred, which faxed to SCCF a list of her prescriptions, including her hormone medications.  After a month-long delay, she received some but not all of that medication, and even those medications were administered inconsistently.  (Defs.' Ex. S Part 1 at COS 972-985.)

Suffolk County argues that, for each inmate denied hormone therapy medication, "the denial was based upon specific, individualized facts of each case," and that "[t]here is simply no evidence on which a jury could find a custom or policy of denying hormone therapy medication (or any other form of treatment), or providing 'inadequate medical care' to inmates suffering from gender dysphoria."  (Defs.' Mem. at 27.)  But, as Dr. Geraci admitted as a representative of Suffolk County in his Rule 30(b)(6) deposition, the records do not reflect any indication of the individual circumstances that led to the delay or denial of hormone medication or any exercise of medical judgment by Suffolk County in making those decisions.  (*See, e.g.*, Pl.'s Ex. G at 150:13-152:15.)  Moreover, whether such individual circumstances are the reason for the consistent denials of treatment for transgender inmates or simply pretext for a practice of delaying or denying such treatment relies on the particular facts of each case and cannot be resolved on summary judgment.

Further, contrary to Defendants' arguments, Ms. Sunderland *can and does* state a municipal liability claim based on just the actions in her case because Dr. Geraci had "final

28

authority" over medical decisions at SCCF, and his actions are therefore attributable to the municipality.  *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (where an individual has final policymaking authority, a plaintiff may state a claim against the municipality based on the conduct of that individual); *Rookard v. Health & Hosp. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.").  "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Id.*  Dr. Geraci repeatedly testified at his deposition that he is the person with "responsibility for the care that's provided at [SCCF]" (Pl.'s Ex. F at68: 2-11), a fact that is also apparent from Ms. Sunderland's records.  (Defs.' Ex. C at COS 1, COS 11.)  Dr. Geraci thus had final authority over significant matters involving the exercise of discretion and, accordingly, his decisions reflected the policy of Suffolk County.

## IV.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

There is no question in this case that Ms. Sunderland "had a clearly established 'right to be free from deliberate indifference to [her] serious medical needs.'"  *Smith v. Greifinger*, 208 F.3d 203 at *3 (2d Cir. 2000) (quoting *LeBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998)). The Individual Defendants argue, however, that they are entitled to qualified immunity because, in 2012 and 2013, it was not known (i) that gender dysphoria was a serious medical condition, or (ii) that hormone medication was medically necessary treatment.  (Defs.' Mem. at 29.)  Both of those claims are untrue.  Second, Defendants argue that, even if Ms. Sunderland's right to hormone therapy was clearly established, Defendants are entitled to qualified immunity because their conduct in this case was objectively reasonable.  As demonstrated above, it was not.

A.      **Gender Dysphoria Has Been Recognized**
        **as a Serious Medical Condition for Decades.**

While Defendants concede that Ms. Sunderland suffers from gender dysphoria, they argue that "gender dysphoria was [not] known (in 2012 and 2013) to be a serious medical condition." (Defs.' Mem. at 29.) In fact, gender dysphoria has been widely recognized in the medical community for decades as a serious medical condition. (*See supra* at 10.) Indeed, the American Psychiatric Association first recognized gender identity disorder in 1980, with the World Health Organization following suit in 1992. (Pl.'s Ex. A; Pl.'s Ex. C at 327.) WPATH began publishing Standards of Care for Gender Identity Disorders in 1979 and revised those standards of care in 1980, 1981, 1990, 1998, 2001, and 2012—all *before* Ms. Sunderland entered SCCF. (Pl.'s Ex. D at n.1.) And in June 2008—more than *four years* before Ms. Sunderland entered SCCF—the American Medical Association confirmed in a public resolution that gender dysphoria is a "serious medical condition." (Pl.'s Ex. B at 1.)

In line with the conclusions of the medical community, courts have "consistently considered transsexualism a 'serious medical need' for purposes of the Eighth Amendment." *Wolfe v. Horn*, 130 F. Supp. 2d 648, 652 (E.D. Pa. 2001); *accord Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Allard v. Gomez*, 9 F. App'x 793, 794 (9th Cir. 2001); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244-45 (D. Mass. 2012); *Brooks v. Berg*, 270 F. Supp. 2d 302, 309 (N.D.N.Y. 2003), *vacated in part on other grounds by Brooks v. Berg*, 289 F. Supp. 2d 286 (N.Y.N.Y. 2003). Thus, there is no basis for Defendants' claim that gender dysphoria was not recognized as a serious medical condition in 2012 and 2013.[9]

---

9.  Defendants attempt to sidestep the clear consensus of the medical and legal community by pointing to the "complexity of the condition" and the "significant advances made . . . in the past five years" to argue that

**B.      Ms. Sunderland Had a Clearly Established Right
To Effective Treatment for Her Gender Dysphoria.**

Defendants appear to define the "clearly established right" in this case as the right of an inmate suffering from gender dysphoria to receive hormone medication and argue that "the condition has not been found to constitutionally require the administration of hormone therapy medication." (Defs.' Mem. at 32.)  That argument is incorrect in two respects.

First, as discussed above, Defendants in this case did not merely refuse to provide hormone therapy to Ms. Sunderland—they failed to provide *any* treatment for her gender dysphoria.  As a result, the right implicated in this case is Ms. Sunderland's right to receive treatment for gender dysphoria.  That right is indisputably well-established, as even the cases that Defendants cite demonstrate.  *See, e.g.*, *Fields*, 653 F.3d at 555-56  (prison officials must provide treatment for gender dysphoria); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 U.S. App. LEXIS 1716 at *11 (6th Cir. Jan. 28, 1997) (same); *Brown v. Zavaras*, 63 F.3d 967, 970 fn. 2 (10th Cir. 1995) (same); *Brooks v. Berg*, 289 F. Supp. 2d 286, 287 (N.Y.N.Y. 2003); *see also* Def. Mem. at 32-33 (noting that *Brown* and *Murray* mandate treatment for gender dysphoria).

Second, even if it were appropriate to define the right at issue in this case as the right to receive hormone medication as treatment for gender dysphoria, the medical community agrees

---

gender dysphoria was not well understood in 2012.  (Defs.' Mem. at 29.)  But Defendants do not and cannot show that the complexity of the condition or any advances in the understanding of it changed the consensus for the past few decades that gender dysphoria is a serious medical need.  Defendants point to testimony from Ms. Sunderland's experts that the terms "transsexual" and "transgender" to describe individuals with gender dysphoria are not used consistently by all medical professionals.  (*Id.* at 29-30.)  But that terminology has nothing to do with whether gender dysphoria is a serious medical need and does not bear on the clinical diagnosis for that condition.  Similarly, the fact that the DSM-V formally changed the name of the condition from gender identity disorder to gender dysphoria and reclassified it from an "illness" to a "condition" does not bear on the seriousness of the condition or its treatment.  Finally, Defendants mischaracterize the deposition testimony of Ms. Sunderland's expert witness, Dr. Matthew Leinung, regarding whether "being a transgender person" is a "serious medical need."  (*Id.* at 31-32.)  Relying on established medical guidelines, Dr. Leinung stated in his report that gender dysphoria is a serious medical need (Pl.'s Ex. O at ¶¶ 6, 13, 60), and at his deposition noted only that it "is a hard question to answer" whether transgender people who do not experience dysphoria as a result of their gender identity would truly consider themselves to be transgender (Pl.'s Ex. P at 59:6-60:23).

that hormone therapy is medically necessary for certain patients with gender dysphoria.  (*See supra* at 12-14.)  On that basis, courts have held that the failure to provide hormone therapy to inmates with gender dysphoria actually violated or could be found at trial to violate the Eighth Amendment.  *See, e.g.*, *Fields*, 653 F.3d at 555-56 (Eighth Amendment requires "effective treatment" of serious medical needs, and the evidence established that "plaintiffs could not be effectively treated without hormones"); *South v. Gomez*, No. 99-15976, 2000 WL 222611, at *2 (9th Cir. 2000) (affirming order that prison must provide hormone therapy to transgender inmate); *Phillips v. Michigan Dep't of Corrections*, 731 F. Supp. 792, 800-01 (W.D. Mich. 1990) (ordering prison to provide hormone therapy to transgender inmate), *aff'd* 932 F.2d 969 (6th Cir. 1991); *Wolfe v. Horn*, 130 F. Supp. 2d 648, (E.D. Pa. 2001) ("abrupt termination of prescribed hormonal treatments . . . could constitute 'deliberate indifference'").

Defendants argue that they are immune from liability for their failure to provide hormone therapy to Ms. Sunderland because hormone therapy is only "one form of treatment" for gender dysphoria, and Defendants provided other adequate treatment.  (Defs.' Mem. at 30-31.)  As discussed above, Defendants did not actually provide any treatment for Ms. Sunderland's gender dysphoria.  (*See supra* at 10-12.)  Moreover, the medical community agrees that, for some patients, hormone therapy is "medically necessary"—in other words, it is the *only effective* treatment for gender dysphoria.  (*See supra* at 12-14.)

Defendants ignore that evidence, instead relying on citations from Ms. Sunderland's experts that gender dysphoria can be treated through psychotherapy.  But psychotherapy is not appropriate as the *sole* treatment for gender dysphoria unless it is sufficient on its own to resolve that dysphoria.  (*See* Pl.'s Ex. Dat 8-10 (for many individuals, hormone medication and/or sex reassignment surgery in addition to psychotherapy is medically necessary).)  The fact that Ms.

Sunderland's physicians both prior to and following her incarceration at SCCF prescribed hormone medication for her gender dysphoria evidences their judgment that such medication was necessary to treat her condition.  Dr. Yarbrough's expert report came to the same conclusion. (Pl.'s Ex. M at 4-6.)

Defendants also point to testimony from Ms. Sunderland's experts that it is "hard to say" how acute gender dysphoria is or what an acceptable time frame would be for delay in access to hormone therapy.  (Defs.' Mem. at 30.)  Defendants' discussion of that testimony conveniently fails to mention that it was given in response to general questions posed in the abstract— questions that are impossible to answer because the acuteness of gender dysphoria will depend on the patient, and the acceptable time frame for any delay in access to care would depend on the particular factual circumstances of each case.  (*See* Pl.'s Ex. N at 90:14-91:14; Pl.'s Ex. P at 149:24-151:22.)  In commenting on Ms. Sunderland's case in particular, Ms. Sunderland's experts opined that Defendants' deprivation of treatment was medically unjustified and unacceptable and that Ms. Sunderland suffered from dysphoria that required treatment with hormones.  (Pl.'s Ex. O at ¶¶ 46-61; Pl.'s Ex. M  at 4-6.)

### C.    Depriving Ms. Sunderland of Treatment for Her<br>Gender Dysphoria Was Not Objectively Reasonable.

Defendants cannot establish as a matter of law that it was objectively reasonable for them to believe that depriving Ms. Sunderland of treatment for her gender dysphoria was lawful.  As detailed above, Defendants had no legitimate medical basis for discontinuing Ms. Sunderland's hormone therapy, and the facts demonstrate that Defendants consciously disregarded a substantial risk of serious harm that would result from their decision or, even worse, harbored animus against Ms. Sunderland as a transgender patient.  (*See supra* at 14-19, 24.)  The fact that Ms. Sunderland's doctors had previously discontinued certain hormone medication does not help

Defendants here because the circumstances under which Ms. Sunderland's doctors did so are vastly different than those presented by this case. (*See supra* at 3-4.)

The decision of the Suffolk County Supreme Court to dismiss Ms. Sunderland's medical writ in October 2013 also does not support Defendants' position. (*See* Def. Mem. at 34.) Ms. Sunderland was *pro se* in that proceeding, the writ actually pertained to her lack of surgical follow-up care rather than her lack of hormone therapy, and the court did not have the benefit of the full record available in this case. (Defs.' Ex. Q at 11:7-24); *see also Smith v. Greifinger*, 208 F.3d 203, at *4 (2d Cir. Mar. 17, 2000) (concluding that a state court ruling in favor of defendant did not "take the question of objective reasonableness out of the hands of a fact finder" because that ruling was based on an incomplete factual record that lacked the plaintiff's full medical file or any expert evidence). Even on the basis of that limited factual record, the state court inquired into Ms. Sunderland's lack of hormone therapy and concluded that the circumstances presented a "borderline" case for a constitutional violation, noting that it was "not happy with [SCCF's] response" to Ms. Sunderland's request for treatment because it appeared that Defendants had "rope-a-doped [the situation] in the hopes that Ms. Sunderland would be transferred upstate." (Defs.' Ex. R at 5:14-24.) Thus, far from "underscoring" the lawfulness of Defendants' action, the decision of the writ court only highlights the serious concerns about the conduct of Defendants in this case.

## CONCLUSION

For the reasons set forth above, Ms. Sunderland respectfully requests that this Court deny Defendants' motion for summary judgment.

Dated:      New York, New York
            October 18, 2017

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: _____/s/Fara Tabatabi_____

Seth D. Rothman
Fara Tabatabai
Ryan Y. Kim
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
seth.rothman@hugheshubbard.com
fara.tabatabai@hugheshubbard.com
ryan.kim@hugheshubbard.com

David B. Shanies
Joel A. Wertheimer
DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, 6th Floor
New York, New York 10003
Telephone: (212) 951-1710
Facsimile: (212) 951-1350
david@shanieslaw.com
joel@shanieslaw.com

*Attorneys for Plaintiff Jessica Sunderland*

# Certificate of Service

   I hereby certify that on October 18, 2017, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

    DENNIS M. BROWN
    SUFFOLK COUNTY ATTORNEY
    Attorney for Defendants
    H. Lee Dennison Building
    100 Veterans Memorial Highway
    P.O. Box 6100
    Hauppauge, New York 11788

            HUGHES HUBBARD & REED LLP

              /s/ Fara Tabatabai
              Fara A. Tabatabai
              One Battery Park Plaza
              New York, New York 10004